# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| AMERICAN OVERSIGHT,<br><br>　　　　　Plaintiff,<br><br>　　v.<br><br>U.S. GENERAL SERVICES<br>ADMINISTRATION,<br><br>　　　　　Defendant. | Civil Action No. 17-1267 (BAH)<br><br>Chief Judge Beryl A. Howell |

## <u>MEMORANDUM OPINION</u>

The plaintiff, American Oversight ("AO"), a "nonpartisan organization committed to the promotion of transparency in government," Compl. ¶ 5, ECF No. 1, challenges the response of the General Services Administration ("GSA"), to a request for, *inter alia*, records reflecting communications between GSA and any member of the presidential transition team ("PTT") for then-president-elect Donald Trump, *id.* ¶ 19, which request was submitted pursuant to the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552. The parties have now cross-moved for summary judgment. Def.'s Mot. Summ. J. ("Def.'s Mot."), ECF No. 12; Pl.'s Cross-Mot. Summ. J. & Opp'n Def.'s Mot. ("Pl.'s Cross-Mot."), ECF No. 14. For the reasons set forth below, summary judgment is granted to the plaintiff with respect to GSA's failure to produce non-exempt attachments to responsive emails, GSA's withholding, under Exemption 5, of information shared with the PTT or other non-federal agency entities, and GSA's withholdings under FOIA's Exemption 6, and the parties' cross-motions for summary judgment are denied, without prejudice, with respect to the sufficiency of GSA's search and GSA's withholdings under FOIA's Exemption 5.

# I.    BACKGROUND

In 2013, GSA entered into a contract with the Trump Organization to develop and lease the Old Post Office building in Washington, D.C., as Trump International Hotel.  Compl. ¶¶ 7–8. The lease stipulated that "[n]o . . . elected official of the Government of the United States . . . shall be admitted to any share or part of this Lease, or to any benefit that may arise therefrom," *id.* ¶ 9, which provision raised concerns from "[e]thics experts and members of Congress … regarding the propriety of President Trump's continued financial interest in the Trump International Hotel," *id.* ¶ 10.  Prompted by these concerns, the plaintiff, filed several FOIA requests for records related to GSA's lease of the Old Post Office building and contacts between GSA and the PTT, *id.* ¶¶ 15, 19, 23, including the FOIA request, dated April 5, 2017, at issue in this case for "[a]ll records reflecting communications (including emails, telephone call logs, calendar entries, meeting agendas, or any other records reflecting communications) between GSA and any member of the Trump transition team" from November 8, 2016 through January 20, 2017, that is, from the 2016 election through President Trump's inauguration, *id.* ¶ 19.[1] GSA's "initial search . . . returned over 61,000 documents," Def.'s Statement of Material Facts As To Which There Is No Genuine Issue ("Def.'s SMF") ¶ 5, ECF No. 12 at 3–6 (citing Suppl. Decl. of Travis Lewis, GSA's Director of the FOIA and Records Manager Division ("Lewis Decl.") ¶ 9, ECF No. 13, replacing earlier version of declaration, *id.* at 1 n.1), or "over 100,000 emails," Def.'s Mot., Ex. D at 6, Email from GSA's Duane Smith to AO's Cerissa Cafasso (July 24, 2017), ECF No. 12-5.

---

[1] The complaint originally challenged GSA's response to two additional FOIA requests submitted by the plaintiff, but the parties have resolved any dispute regarding those requests.  *See* Third Joint Status Report ¶¶ 1–3, ECF No. 10.  In addition, after summary judgment briefing had commenced, GSA produced to the plaintiff an unredacted copy of a Memorandum of Understanding provided by the PTT to GSA, thereby resolving that part of the parties' dispute.  *See* Def.'s Reply Supp. Def.'s Mot. & Opp'n Pl.'s Cross-Mot ("Def.'s Opp'n") at 8, ECF No. 24.

In light of the significant number of potentially responsive documents, the parties conferred about the scope of the FOIA request, and on July 26, 2017, nearly one month after the plaintiff initiated the instant case, the plaintiff narrowed the scope by providing GSA with search terms and locations to be searched and specifying the names of individuals who potentially had responsive records. Def.'s SMF ¶ 5 (citing Lewis Decl. ¶ 9); Pl.'s Statement of Material Facts as to Which There is No Genuine Issue ("Pl.'s SMF") at 2 ¶ 5, ECF No. 14-4. Specifically, the plaintiff described as "correct" GSA's search scope as covering "all records reflecting communications," including "emails, telephone call logs, calendar entries, meeting agendas, or any other records reflecting communications between GSA and Casey Coleman, Charles James, Robert Mackichan, Richard Milone, George Nesterczuk, Kurt Stout, Robert Tompkins, Donald Williams (the GSA landing team for the Trump Administration)."[2] Def.'s Mot., Ex. D at 1, Email from AO's Cerissa Cafasso to GSA's Duane Smith (July 26, 2017). GSA acknowledged that these eight named individuals were "listed on the greatagain.gov [s]ite" of the PTT, and "are those who were the members of the Agency Transition team in its entirety." *Id.*, Email from GSA's Duane Smith to AO's Cerissa Cafasso (July 26, 2017). In addition, GSA agreed to search for "all records reflecting communications (including emails, telephone call logs, calendar entries, meeting agendas, or any other records reflecting communications) between any member of the Trump transition team and" an enumerated list of twenty-two GSA employees "that contain any of the following [nine] terms: OPO, Post Office, Hotel, Trump International, THI, Ivanka, 1100 Penn, 1100 Pennsylvania, or Lease." *Id.* Ultimately, however, GSA apparently

---

[2]     GSA searched only for the full names of these PTT members, without including any name variation, Lewis Decl. ¶ 10, but the plaintiff raises no issue with the search terms, *see* Pl.'s Mem Supp. Pl.'s Cross-Mot & Opp'n Def.'s Mot. ("Pl.'s Opp'n"), ECF No. 14-1; Pl.'s Reply Supp. Pl.'s Cross-Mot. ("Pl.'s Reply"), ECF No. 28.

searched for only seven terms, combining "Post Office" and "Hotel" into "Post Office Hotel," and did not search for "Ivanka" at all. Lewis Decl. ¶ 10.[3]

After obtaining the plaintiff's clarified parameters, GSA's Office of the Chief Information Officer ("OCIO") then conducted a search following GSA's "practice" for requests containing "the word 'communication(s)'" by "search[ing] each employee's emails, calendar logs and shared drive files for responsive records by using the key words searches and dates as requested by the requester." *Id.* ¶ 11. GSA's records retention policy requires "all agency employee communications" to be "stored via email /or on the shared drive." *Id.*

GSA's searches of "emails, calendar logs and shared drive files," *id.*, identified 3,925 pages, of which GSA's Director of FOIA and Records Management Division determined only 3,730 pages were actually responsive to the plaintiff's request, Def.'s SMF ¶ 11 (citing Lewis Decl. ¶ 12), with the remaining 195 pages consisting of nonresponsive "news articles and fliers," Lewis Decl. ¶ 12. GSA produced those 3,730 pages to the plaintiff on September 1, 2017, with redactions "pursuant to FOIA Exemptions 4, 5, and 6." Def.'s SMF ¶ 12 (citing Lewis Decl. ¶ 13); *see also* Def.'s Mot., Ex. F, Letter from GSA's Travis Lewis to AO's Austin Evers (Sept. 1, 2017), ECF No. 12-7. Despite the extensive redactions, which the plaintiff characterizes as appearing on "at least 3,721" of the produced pages, Pl.'s Mem Supp. Pl.'s Cross-Mot & Opp'n Def.'s Mot. ("Pl.'s Opp'n") at 1, ECF No. 14-1, GSA originally provided a two-page *Vaughn* Index, *see* Def.'s Mot, Ex. A, *Vaughn* Index, ECF No. 12-2. After the plaintiff challenged the sufficiency of the original index, GSA provided a lengthier Corrected Revised *Vaughn* Index ("Revised *Vaughn*"), ECF No. 27-1.

---

[3]     Again, the plaintiff raises no issue about the modification of the nine agreed-upon search terms. *See* Pl.'s Opp'n; Pl.'s Reply.

At this point, the plaintiff has withdrawn any challenge to withholdings under Exemption 4, *see* Pl.'s Reply Supp. Pl.'s Cross-Mot. ("Pl.'s Reply") at 1 n.1, ECF No. 28, and GSA has "withdrawn all withholdings based on the deliberative process privilege and the attorney work-product doctrine," and "relies exclusively on the attorney-client privilege" under Exemption 5, Def.'s Reply Supp. Def.'s Mot. & Opp'n Pl.'s Cross-Mot ("Def.'s Opp'n") at 9, ECF No. 24. Specifically, GSA relies on the attorney-client privilege and Exemption 5 to withhold material on pages 1–80, 129–70, 171–683, 703–2034—or nearly 2,000 pages of the responsive "[c]ommunications between GSA and the Presidential Transition Team"—explaining that the material reflects "[p]ortions of internal communications sent by GSA attorneys to GSA employees providing legal opinions and guidance based on questions and information provided by GSA employees." Revised *Vaughn* at 1, 4–6. After GSA's briefing was complete, GSA produced five pages with material previously withheld under Exemption 5. Pl.'s Reply Supp. Pl.'s Cross-Mot., Attach. 1, Second Decl. of Cerissa Cafasso, Attorney, AO (Feb. 20, 2018) ("Second Cafasso Decl.") ¶ 6, ECF No. 28-1. The plaintiff notes, however, that twenty-nine of GSA's Exemption 5 redactions remain without explanation in the Revised *Vaughn* Index. *Id.* ¶¶ 16–17.[4]

GSA has also withheld, under Exemption 6, the "names and contact information for non-federal employees," based on the agency's "determin[ation] that any public interest in the release of the names of private individuals here was not outweighed by the disclosure of that information." Revised *Vaughn* at 1–10. In response to the Court's inquiry about this justification for Exemption 6 withholdings, in light of the fact that PTT members' names were made publicly available on a PTT website, *see* Minute Order (Apr. 9, 2018), GSA submitted a

---

[4] Any future *Vaughn* Index submitted by GSA in this case is required to provide more clarity on the extent and precise page of any redacted material to explain fully and clearly any withholding.

supplemental affidavit clarifying that the PTT members' names were redacted simply because they were not federal employees, Second Decl. of Travis Lewis, GSA's Director of the FOIA and Records Manager Division ("Second Lewis Decl.") (Apr. 11, 2018) ¶ 4, ECF No. 29-1.

After GSA was granted six extensions to complete its briefing, *see* GSA's motions for time extensions, ECF Nos. 16–23, the parties' cross-motions for summary judgment are now ripe for review.

## II. LEGAL STANDARD

Federal Rule of Civil Procedure 56 provides that summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). "In FOIA cases, 'summary judgment may be granted on the basis of agency affidavits if they contain reasonable specificity of detail rather than merely conclusory statements, and if they are not called into question by contradictory evidence in the record or by evidence of agency bad faith.'" *Judicial Watch, Inc. v. U.S. Secret Serv.*, 726 F.3d 208, 215 (D.C. Cir. 2013) (quoting *Consumer Fed'n of Am. v. U.S. Dep't of Agric.*, 455 F.3d 283, 287 (D.C. Cir. 2006)) (alteration adopted); *see also Students Against Genocide v. U.S. Dep't of State*, 257 F.3d 828, 833 (D.C. Cir. 2001) ("[A]n agency is entitled to summary judgment if no material facts are in dispute and if it demonstrates 'that each document that falls within the class requested either has been produced or is wholly exempt from the Act's inspection requirements.'" (quoting *Goland v. CIA*, 607 F.2d 339, 352 (D.C. Cir. 1978) (alteration adopted))). Indeed, the D.C. Circuit has observed that "the vast majority of FOIA cases can be resolved on summary judgment." *Brayton v. Office of the U.S. Trade Rep.*, 641 F.3d 521, 527 (D.C. Cir. 2011).

The FOIA was enacted "to promote the 'broad disclosure of Government records' by generally requiring federal agencies to make their records available to the public on request." *DiBacco v. U.S. Army*, 795 F.3d 178, 183 (D.C. Cir. 2015) (quoting *U.S. Dep't of Justice v. Julian*, 486 U.S. 1, 8 (1988)). Reflecting the necessary balance between the public's interest in governmental transparency and "legitimate governmental and private interests that could be harmed by release of certain types of information," *United Techs. Corp. v. U.S. Dep't of Def.*, 601 F.3d 557, 559 (D.C. Cir. 2010) (quoting *Critical Mass Energy Project v. Nuclear Regulatory Comm'n*, 975 F.2d 871, 872 (D.C. Cir. 1992) (en banc) (alterations omitted)), the FOIA contains nine exemptions, set forth in 5 U.S.C. § 552(b), which "are explicitly made exclusive and must be narrowly construed," *Milner v. U.S. Dep't of Navy*, 562 U.S. 562, 565 (2011) (internal quotation marks and citations omitted); *see also Murphy v. Exec. Office for U.S. Attys.*, 789 F.3d 204, 206 (D.C. Cir. 2015); *Citizens for Responsibility & Ethics in Wash. v. U.S. Dep't of Justice* ("*CREW*"), 746 F.3d 1082, 1088 (D.C. Cir. 2014); *Pub. Citizen, Inc. v. Office of Mgmt. & Budget*, 598 F.3d 865, 869 (D.C. Cir. 2010). "[T]hese limited exemptions do not obscure the basic policy that disclosure, not secrecy, is the dominant objective of the Act." *Dep't of Air Force v. Rose,* 425 U.S. 352, 361 (1976).

The FOIA authorizes federal courts to "enjoin the agency from withholding agency records and to order the production of any agency records improperly withheld from the complainant." 5 U.S.C. § 552(a)(4)(B). District courts must "determine *de novo* whether non-disclosure was permissible." *Elec. Privacy Info. Ctr. v. U.S. Dep't of Homeland Sec.*, 777 F.3d 518, 522 (D.C. Cir. 2015). When the sufficiency of "the release of information under the FOIA" is challenged, "'the agency has the burden of showing that requested information comes within a FOIA exemption.'" *Pub. Citizen Health Research Grp. v. Food & Drug Admin.*, 185 F.3d 898,

904 (D.C. Cir. 1999) (quoting *Niagara Mohawk Power Corp. v. U.S. Dep't of Energy*, 169 F.3d 16, 18 (D.C. Cir. 1999)); *see also U.S. Dep't of Justice v. Landano*, 508 U.S. 165, 171 (1993) (noting that "[t]he Government bears the burden of establishing that the exemption applies"); *Fed. Open Mkt. Comm. of Fed. Reserve Sys. v. Merrill*, 443 U.S. 340, 352 (1979) (finding that the agency invoking an exemption bears the burden "to establish that the requested information is exempt"); *Elec. Frontier Found. v. U.S. Dep't of Justice*, 739 F.3d 1, 7 (D.C. Cir. 2014). This burden does not shift even when the requester files a cross-motion for summary judgment because "the Government 'ultimately [has] the onus of proving that the [documents] are exempt from disclosure,'" while the "burden upon the requester is merely 'to establish the absence of material factual issues before a summary disposition of the case could permissibly occur.'" *Pub. Citizen Health Research Grp.*, 185 F.3d at 904–05 (quoting *Nat'l Ass'n of Gov't Emps. v. Campbell*, 593 F.2d 1023, 1027 (D.C. Cir. 1978)) (alterations in original).

An agency may carry its burden of showing an exemption was properly invoked by submitting sufficiently detailed affidavits or declarations, a *Vaughn* index of the withheld documents, or both, to demonstrate that the government has analyzed carefully any material withheld and provided sufficient information as to the applicability of an exemption to enable the adversary system to operate. *See Judicial Watch, Inc.*, 726 F.3d at 215 ("In FOIA cases, 'summary judgment may be granted on the basis of agency affidavits if they contain reasonable specificity of detail rather than merely conclusory statements, and if they are not called into question by contradictory evidence in the record or by evidence of agency bad faith.'" (quoting *Consumer Fed'n of Am.*, 455 F.3d at 287) (alteration adopted)); *CREW*, 746 F.3d at 1088 (noting that an agency's burden is sustained by submitting an affidavit that "describe[s] the justifications for nondisclosure with reasonably specific detail, demonstrate[s] that the information withheld

logically falls within the claimed exemption, and [is] not controverted by either contrary evidence in the record nor by evidence of agency bad faith" (quoting *Larson v. U.S. Dep't of State*, 565 F.3d 857, 862 (D.C. Cir. 2009))); *Oglesby v. U.S. Dep't of Army*, 79 F.3d 1172, 1176 (D.C. Cir. 1996) (instructing that an agency's description "should reveal as much detail as possible as to the nature of the document, without actually disclosing information that deserves protection[,] . . . [which] serves the purpose of providing the requestor with a realistic opportunity to challenge the agency's decision." (internal citation omitted)). While "an agency's task is not herculean" it must "'describe the justifications for nondisclosure with reasonably specific detail' and 'demonstrate that the information withheld logically falls within the claimed exemption.'" *Murphy*, 789 F.3d at 209 (quoting *Larson*, 565 F.3d at 862). "Ultimately, an agency's justification for invoking a FOIA exemption is sufficient if it appears 'logical' or 'plausible.'" *Judicial Watch, Inc. v. U.S. Dep't of Def.*, 715 F.3d 937, 941 (D.C. Cir. 2013) (quoting *ACLU v. U.S. Dep't of Def.*, 628 F.3d 612, 619 (D.C. Cir. 2011)); *Larson*, 565 F.3d at 862 (quoting *Wolf v. CIA*, 473 F.3d 370, 374–75 (D.C. Cir. 2007)).

## III. DISCUSSION

The plaintiff challenges three aspects of GSA's response to the FOIA request at issue: (1) the adequacy of GSA's search, Pl.'s Opp'n at 6; Pl.'s Reply at 1–3, ECF No. 28; (2) GSA's failure to produce "attachments to emails exchanged between GSA and the" PTT, Pl.'s Reply at 3; Pl.'s Opp'n at 8–9; and (3) the sufficiency of GSA's explanations for redactions under Exemption 5 and Exemption 6, Pl.'s Opp'n at 17–29; Pl.'s Reply at 6–14. These issues are addressed *seriatim*.

## A. GSA'S SEARCH WAS INADEQUATE

GSA conferred with the plaintiff and advised via email on July 26, 2017, that the agency would search for "all records reflecting communications (including emails, telephone call logs, calendar entries, meeting agendas, or any other records reflecting communications)" between GSA and eight identified PTT members as well as for certain search terms. Def.'s Mot., Ex. D at 1, Email from GSA's Duane Smith to AO's Cerissa Cafasso (July 26, 2017). Contrary to GSA's assurance, however, the plaintiff contends that GSA failed to search "telephone call logs, calendar entries, stand-alone electronic records (*i.e.*, records that were created electronically but never emailed), or paper records," and further that "GSA has systems of records that potentially contain responsive records, and yet the agency has entered no evidence that it searched those systems or an adequate alternative." Pl.'s Reply at 2. GSA does not dispute that no search was conducted of call logs, meeting agendas, or paper records, but apparently contends that a search for these forms of records "goes far beyond what is required by the FOIA," Def.'s Opp'n at 3, and that the search performed was "reasonably tailored" to the request "based on its knowledge of its [own] practices," *id.* at 4.

At the outset, GSA provides conflicting information regarding whether calendar entries were searched. The agency affidavit states that, in searches of the type performed in this case, "calendar logs" are searched. Lewis Decl. ¶ 11; *see also* Def.'s Mem. Supp. Def.'s Mot. ("Def.'s Mem.") at 5, ECF No. 12 at 7 ("When conducting a search for documents responsive to a FOIA request, the OCIO searches each employee's emails, calendar logs, and shared drive files for responsive records."). Nevertheless, while records of emailed calendar invitations were produced, no actual calendar entries or logs were reflected in GSA's production. Thus, based on this record, the plaintiff raises the reasonable suspicion "that the agency almost certainly did not actually search calendars." Pl.'s Opp'n at 7. GSA has been silent in explaining the presence of

calendar invitation emails in its production, without concomitant calendar entries or logs, despite the agency's promise to search for and produce responsive, non-exempt calendar logs. *See* Def.'s Opp'n at 4. In light of the "well defined requests and positive indications of overlooked materials," *Aguiar v. DEA*, 865 F.3d 730, 739 (D.C. Cir. 2017) (quoting *DiBacco v. U.S. Army*, 795 F.3d 178, 188 (D.C. Cir. 2015) (quoting *Valencia-Lucena v. U.S. Coast Guard*, 180 F.3d 321, 326 (D.C. Cir. 1999))), the GSA's silence about the lack of calendar logs fails to assure the Court on summary judgment that the search was reasonable. GSA is directed either to search calendar entries or, if such a search was already performed, to clarify the method and scope of such a search, as well as any withholdings of calendar entries.

With respect to the other forms of records sought by the plaintiff, "[a]gencies have 'a duty to construe a FOIA request liberally.'" *People for the Ethical Treatment of Animals v. Nat'l Institutes of Health, Dep't of Health & Human Servs.* ("*PETA*"), 745 F.3d 535, 540 (D.C. Cir. 2014) (quoting *Nation Magazine, Washington Bureau v. U.S. Customs Serv.*, 71 F.3d 885, 890 (D.C. Cir. 1995)). At the same time, agencies "are not required to . . . perform searches which are not compatible with their own document retrieval systems," *Assassination Archives & Research Ctr., Inc. v. CIA*, 720 F. Supp. 217, 219 (D.D.C. 1989), *aff'd*, No. 89-5414, 1990 U.S. App. LEXIS 27799 (D.C. Cir. Aug. 13, 1990), and they "need not respond to overly broad and unreasonably burdensome requests," *Judicial Watch, Inc. v. U.S. Dep't of State*, 681 F. App'x 2, 4 (D.C. Cir. 2017) (citing *Am. Fed'n of Gov't Emps. v. U.S. Dep't of Commerce*, 907 F.2d 203, 208–09 (D.C. Cir. 1990)); *see also Anderson v. U.S. Dep't of State*, 661 F. Supp. 2d 6, 12 n.3 (D.D.C. 2009) (an agency does not have to "honor a FOIA request that requires it to conduct an unduly burdensome search" (quoting *Pub. Citizen, Inc. v. U.S. Dep't of Ed.*, 292 F.Supp.2d 1, 6 (D.D.C. 2003))). When confronted with a challenge to the adequacy of a search, "an 'agency

must show that it made a good faith effort to conduct a search for the requested records, using methods which can be reasonably expected to produce the information requested,' which it can do by submitting '[a] reasonably detailed affidavit, setting forth the search terms and the type of search performed, and averring that all files likely to contain responsive materials (if such records exist) were searched.'" *Reporters Comm. for Freedom of Press v. FBI*, 877 F.3d 399, 402 (D.C. Cir. 2017) (quoting *Oglesby*, 920 F.2d at 68) (alteration in original).

GSA's description of the search performed falls short of meeting the applicable standard for justifying the scope and method of the search. *See id.* GSA explains that, when processing a FOIA "request which includes the word 'communication(s)' /or any derivative thereof," the GSA's FOIA Office directs the OCIO to search for responsive records in "each employee's emails, calendar logs and shared drive files." Lewis Decl. ¶ 11. GSA further explains that "[i]t is GSA policy via its record retention policy that all agency employee communications and documents are stored via email /or on the shared drive," *id.*, as a justification for limiting the search conducted for records reflecting communications to those two locations (i.e., email and shared drive). In other words, when a request seeks "communications," the GSA reads no further and searches "emails, calendar logs and shared drive files" as a default, Lewis Decl. ¶ 11, irrespective of the specifics of a request. In this case, the plaintiff expressly sought "telephone call logs," Def.'s SMF ¶ 1, and "all records reflecting communications," *id.*, which includes "stand-alone electronic records," and "paper records," Pl.'s Reply at 2, but GSA has not explained whether or how such records were searched for the requested communications. The agency affidavit notes as an afterthought that "our search for responsive records included calendar dates and paper records as well," Lewis Decl. ¶ 28, but is silent as to how that search

12

was conducted, and whether any responsive records were found, and GSA's briefs do not even mention that point.

In other words, GSA performed a search using its default methodology for requests seeking "communications," but fails to take account of the specific aspects of the plaintiff's request that may warrant a broader search.  Consequently, the agency does not adequately demonstrate "that all files likely to contain responsive materials (if such records exist) were searched," *Reporters Comm. for Freedom of Press*, 877 F.3d at 402 (quoting *Oglesby*, 920 F.2d at 68), or that a search other than its default practice would be "unreasonably burdensome," *Judicial Watch, Inc.*, 681 F. App'x at 4; *see also, e.g.*, *Leopold v. U.S. Dep't of Justice*, No. CV 16-1827, 2018 WL 1384124, at *7 (D.D.C. Mar. 19, 2018) (upholding the sufficiency of the FBI's search where the FBI explained the plaintiff's "request for non-investigative records is so broad and non-specific that it is beyond the FBI's 'technical capability'"), or "not compatible with [its] document retrieval systems," *Assassination Archives & Research Ctr.*, 720 F. Supp. at 219.

Accordingly, the parties' cross-motions for summary judgment as to the sufficiency of GSA's search are denied, and GSA is directed either to conduct a search for responsive records, including telephone and calendar logs and paper records, consistent with the request, or explain why the scope of the search performed by the agency was reasonably designed and "calculated to uncover all relevant documents."  *Aguiar v. DEA*, 865 F.3d at 738 (quoting *Morley v. CIA*, 508 F.3d 1108, 1114 (D.C. Cir. 2007)).

## B.    GSA IMPROPERLY WITHHELD EMAIL ATTACHMENTS

GSA's production of responsive emails "failed to include or claim any exemptions with respect to multiple attachments to email communications identified as responsive" to the plaintiff's FOIA request that expressly demanded "[a]ll records reflecting communications

13

(including emails . . . or any other records reflecting communications)."  Pl.'s Opp'n at 7–8.

GSA concedes that "attachments . . . to other responsive documents" were not produced and

justifies the withholding of these attachments due to the agency's interpretation of the plaintiff's

request as "not seek[ing] attachments."  Def.'s Opp'n at 5.  GSA is just wrong.

While the FOIA request does not explicitly refer to attachments, the scope of the request

for "all records reflecting communications" plainly covered parts of email communications that

were in the form of an attachment.  GSA's blinkered literalism, distinguishing emails from email

attachments, is at odds with the agency's "duty to construe a FOIA request liberally."  *PETA*,

745 F.3d at 540 (quoting *Nation Magazine*, 71 F.3d at 890).

Moreover, GSA's precise reasoning for excluding email attachments from the scope of its

search and production, citing the lack of express request for email attachments, has been

expressly rejected by this Court.  *See, e.g.*, *Coffey v. Bureau of Land Mgmt.*, 277 F. Supp. 3d 1,

7–9 (D.D.C. 2017) (holding that a request for "all emails" reasonably encompassed attachments

to responsive emails, particularly where the emails make specific reference to the attachments);

*Bagwell v. U.S. Dep't of Justice*, No. 15-CV-0531, 2018 WL 1440177, at *1–2 (D.D.C. Mar. 22,

2018) (describing that agency's search for "any and all [responsive] records" as naturally

encompassing both "emails (and attachments)"); *Leopold v. Nat'l Sec. Agency*, 196 F. Supp. 3d

67, 70, 76 (D.D.C. 2016) (requiring the Department of Justice's Office of Legal Counsel to "to

search the email files of departed OLC attorneys, as well as any attachments to those emails" as

part of a search for "any and all [responsive] memoranda and legal opinions" (alteration

adopted)); *accord Energy Future Coal. v. OMB*, 200 F. Supp. 3d 154, 163 (D.D.C. 2016)

(approving production schedule in response to FOIA request that "exclude[d] attachments to

emails from the search for responsive documents, without prejudice to Plaintiffs' right to receive

within 60 days the responsive attachments, subject to applicable FOIA exemptions"); *cf. Gilman v. U.S. Dep't of Homeland Security*, 32 F. Supp. 3d 1, 21–24 (D.D.C. 2017) (holding that production of email attachments in response to FOIA request was not required where parties had agreed to limit production of emails to the same production the agency had made in previous litigation, which production had not included email attachments).

Indeed, as in *Coffey*, emails produced to the plaintiff refer to attachments. *See* Pl.'s Reply at 5 (listing seven emails that described or referred to attachments). Thus, even without "a *per se* rule that an email and its attachment must be treated as a single record," *Coffey*, 277 F. Supp. 3d at 8, the attachments to already-produced emails appear manifestly part of the "communications" between GSA and the PTT and, absent any agency explanation why not, "belong together," *Parker v. U.S. Dep't of Justice, Office of Prof'l Responsibility*, 278 F. Supp. 3d 446, 452 (D.D.C. 2017).[5] Even if the emails did not refer to attachments, however, the plaintiff is correct that the "attachments themselves are independently responsive to [AO's] request because they were communicated between GSA and" the PTT. Pl.'s Opp'n at 9 n.1.

Accordingly, the plaintiff is entitled to summary judgment regarding GSA's failure to produce attachments to responsive emails. GSA is directed to produce promptly to the plaintiff any attachments to the already-produced emails, unless the agency provides a detailed justification explaining why the attachment, in full or part, is exempt.

### C. GSA'S WITHHOLDINGS ARE NOT ADEQUATELY SUPPORTED

GSA withheld information under FOIA Exemptions 5 and 6, but for the reasons set out below, fails to provide adequate support for these withholdings.

---

[5] GSA relies on a single case, *Am. Chemistry Council, Inc. v. U.S. Dep't of Health & Human Servs.*, 922 F. Supp. 2d 56, 62 (D.D.C. 2013), to justify withholding of email attachments, Def.'s Opp'n at 5, but this reliance is wholly misplaced since the issue of whether email attachments should be included within the scope of a FOIA request seeking "all records reflecting communications" is simply not addressed in this case.

### 1. GSA's Explanation For Invocation of Exemption 5 Is Insufficient

GSA indicates that nearly 2,000 pages contain redactions under Exemption 5 as protected by attorney-client privilege. Revised *Vaughn* Index at 1, 4–6. The plaintiff argues that GSA has provided insufficient, and in some cases no, justification for these Exemption 5 redactions. Pl.'s Reply at 10–11.[6] As support, the plaintiff points to "a review of the newly produced records which GSA had previously withheld under Exemption 5" as "creating serious doubts about whether GSA has been applying the appropriate standard for its Exemption 5 assertions more generally." *Id.* at 14. GSA counters Exemption 5 has been properly invoked "based on the attorney-client privilege" to withhold "internal GSA communications exchanged between GSA staff and GSA attorneys." Def.'s Opp'n at 9.

FOIA's Exemption 5 applies to "inter-agency or intra-agency memorandums or letters that would not be available by law to a party other than an agency in litigation with the agency." 5 U.S.C. § 552(b)(5). Two conditions must be met for a record to qualify for withholding under this exemption: "[1] its source must be a Government agency, and [2] it must fall within the ambit of a privilege against discovery under judicial standards that would govern litigation against the agency that holds it." *U.S. Dep't of Interior v. Klamath Water Users Protective Ass'n*, 532 U.S. 1, 8 (2001); *see also Nat'l Inst. of Military Justice v. U.S. Dep't of Def.*, 512 F.3d 677, 680 & n.4 (D.C. Cir. 2008). The attorney-client privilege is a proper basis for an agency to invoke Exemption 5. *Nat'l Ass'n of Criminal Def. Lawyers v. U.S. Dep't of Justice Exec. Office*

---

[6] The plaintiff's suggested remedy of *in camera* review of the documents at issue, Pl.'s Reply at 14, is rejected at this juncture. The D.C. Circuit has explained that "*in camera* review is generally disfavored. It is 'not a substitute for the government's obligation to justify its withholding in publicly available and debatable documents.'" *PHE, Inc. v. U.S. Dep't of Justice*, 983 F.2d 248, 253 (D.C. Cir. 1993) (quoting *Schiller v. NLRB*, 964 F.2d 1205, 1209 (D.C. Cir. 1992)).

*for U.S. Attys. & U.S. Dep't of Justice*, 844 F.3d 246, 249 (D.C. Cir. 2016) (citing *Coastal States Gas Corp. v. U.S. Dep't of Energy*, 617 F.2d 854, 862 (D.C. Cir. 1980)).

The attorney-client privilege applies to a "confidential communication between attorney and client if that communication was made for the purpose of obtaining or providing legal advice to the client." *In re Kellogg Brown & Root, Inc.*, 756 F.3d 754, 757 (D.C. Cir. 2014); *see also In re Lindsey*, 158 F.3d 1263, 1270 (D.C. Cir. 1998). For the attorney-client privilege to apply, the communications must have occurred "for the purpose of securing *primarily* either (i) an opinion on law or (ii) legal services or (iii) assistance in some legal proceeding." *In re Grand Jury*, 475 F.3d 1299, 1304 (D.C. Cir. 2007) (emphasis added) (internal quotation marks omitted). Thus, in the FOIA context, information withheld by the agency based on attorney-client privilege must be "information . . . [that] was communicated to or by an attorney as part of a professional relationship" where the agency can "demonstrate[] that the information is confidential. If the information has been or is later shared with third parties, the privilege does not apply." *Mead Data Cent., Inc. v. U.S. Dep't of Air Force*, 566 F.2d 242, 253 (D.C. Cir. 1977) (footnote omitted); *see also Coastal States*, 617 F.2d at 863 (stating that an agency must "demonstrate a fundamental prerequisite to assertion of the privilege: confidentiality both at the time of the communication and maintained since").

At the outset, GSA concedes that, based on Justice Department guidance, "transition teams are considered nonagencies for purposes of the FOIA," Second Lewis Decl. ¶ 4, meaning that Exemption 5 cannot apply to any communications between GSA and the PTT, *see Klamath*, 532 U.S. at 9, 12 ("[T]he first condition of Exemption 5 is no less important than the second; the communication must be 'inter-agency or intra-agency' . . . [and] [t]here is . . . no textual justification for draining the first condition of independent vitality" (quoting 5 U.S.C. §

552(b)(5))).  Thus, to the extent that GSA relied on under Exemption 5 to withhold any communications between GSA and the PTT—and the plaintiff notes at least three examples, Pl.'s Cross-Mot, Attach. 3, Decl. of Cerissa Cafasso, Attorney, AO (Dec. 22, 2017) ("Cafasso Decl.") ¶ 15, ECF No. 14-3, though those three pages have since been produced without Exemption 5 redactions, Second Cafasso Decl. ¶¶ 6–8—it must produce the withheld material to the plaintiff.

In its Revised *Vaughn* Index, GSA clarified that "[p]ortions of internal communications sent by GSA attorneys to GSA employees providing legal opinions and guidance based on questions and information provided by GSA employees," were withheld.  Revised *Vaughn* at 1, 4–6.  Plainly, as the plaintiff correctly observes, the attorney-client privilege "does not protect a communication simply because an attorney was involved."  Pl.'s Opp'n at 27.  More is necessary for this privilege to attach, including that the communication was and remains confidential, *see Coastal States*, 617 F.2d at 863, and that the communication had a primary purpose of obtaining or providing legal advice, *see In re Kellogg Brown & Root, Inc.*, 756 F.3d at 757.  GSA fails adequately to show these prerequisites for the attorney-client privilege.

GSA does not assert or "demonstrate" that the communications were, and remain, confidential.  *See Coastal States*, 617 F.2d at 863.  While GSA's description of the withheld material as "internal communications" suggests confidentiality, GSA has not met its burden of "demonstrat[ing] . . . confidentiality both at the time of the communication and maintained since."  *Id.*  Moreover, GSA has also failed to establish that the "advice given [was] predominantly legal . . . in nature."  *Boca Investerings P'ship v. United States*, 31 F. Supp. 2d 9, 11–12 (D.D.C. 1998) (quoting *North Am. Mortgage Investors v. First Wisconsin Nat'l Bank*, 69 F.R.D. 9, 11 (E.D. Wis. 1975)).

The plaintiff provides two compelling examples raising significant questions about GSA's reliance on the attorney-client privilege for withholdings. In the first example, an employee of the World War I Centennial Commission, named "Chris," asked Tom Hodnett, a GSA employee, via email, for "help get[ting] in direct contact with the GSA Transition Team," since other efforts to contact PTT had been unsuccessful, including an effort by GSA's Neil Skidmore to "pass [the Commission's] request to whoever it is with whom he is talking on the transition team . . . ." Cafasso Decl., Ex. 2, Email to GSA's Tom Hodnett (Jan. 4, 2017), ECF No. 14-3 at 49. Hodnett forwarded that request to Seth Greenfeld, a GSA Senior Assistant General Counsel, whose response was then forwarded to Neil Skidmore, with the explicit statement that "[Greenfeld] gave me some information that I passed along to Chris." *Id.* at 48, Email from GSA's Tom Hodnett to GSA's Neil Skidmore (Jan. 4, 2017). GSA has withheld the GSA attorney's response as privileged, despite the fact that this email chain indicates that the attorney's "information" was relayed to a third party. In this context, the plaintiff rightly asks: "How was Mr. Hodnett's first inquiry considered a solicitation of legal advice? What is confidential about a GSA employee relaying an inquiry from the PTT? If Mr. Hodnett passed on to a third party the information Mr. Greenfeld gave him, how is it still protected by privilege?" Pl.'s Reply at 13. GSA provides no answers to these obvious questions about whether the attorney-client privilege was properly invoked by GSA.

In a second example, Neil Skidmore, a non-lawyer GSA employee, forwarded to two GSA attorneys an email from a PTT member asking whether GSA had a centralized list of all Executive Orders directed to GSA, and Greenfeld's response to the forwarded email is redacted under Exemption 5. Cafasso Decl., Ex. 2 at 18, Email from GSA's Seth Greenfeld to GSA's Neil Skidmore and GSA's Lennard Loewentritt (Jan. 5, 2017). Skidmore's email asking for a

list of Executive Orders does not appear aimed at "securing primarily either (i) an opinion on law or (ii) legal services or (iii) assistance in some legal proceeding." *In re Grand Jury*, 475 F.3d at 1304 (internal quotation marks omitted). While the PTT request simply inquires about the availability of a convenient resource in the form of a list of relevant Executive Orders, according to GSA's Revised *Vaughn* Index, Greenfeld's response email "provid[ed] legal opinions and guidance" and contained "legal guidance." Revised *Vaughn* at 1. Information about the availability of a resource list, even if provided by an attorney, falls far afield of the provision of legal advice necessary for the attorney-client privilege to attach. *Boca Investerings*, 31 F. Supp. 2d at 11 (noting that an attorney "must not only be functioning as an advisor, but the advice given must be predominately legal" for the attorney-client privilege to apply (quoting *North Am. Mortgage Investors*, 69 F.R.D. at 11)). Moreover, given the context, to the extent that the GSA attorney's response regarding the availability of any list of pertinent Executive Orders was then shared with the requesting PTT member, no privilege would apply.

These examples undermine confidence that GSA has properly invoked the attorney-client privilege to withhold material under Exemption 5. Indeed, more broadly, GSA has not "describe[d] with sufficient particularity the nature of the legal issue or issues for which advice was sought." *Ctr. for Biological Diversity v. U.S. Envtl. Prot. Agency*, 279 F. Supp. 3d 121, 152 (D.D.C. 2017) (citing *Coastal States*, 617 F.2d at 862–63). Thus, its "brief justifications fail[] to provide the Court with much of the information required to substantiate an attorney-client privilege claim." *Citizens for Responsibility & Ethics in Washington v. U.S. Dep't of Justice*, 955 F.Supp.2d 4, 21 (D.D.C. 2013).

Accordingly, the parties' cross-motions for summary judgment with respect to the GSA's withholdings under Exemption 5 are denied. GSA may either produce the material withheld

under Exemption 5 or submit a fulsome explanation with sufficient information to assess

whether *each* redaction under Exemption 5 is properly withheld under the attorney-client

privilege.[7]

### 2. *GSA Improperly Withheld Publicly Available Transition Team Members' Names Under Exemption 6*

The plaintiff contends that the GSA improperly redacted the names of known PTT

members from the production because, in weighing those members' privacy interest against "the

public's interest in understanding the relationship between the PTT and the agency responsible

for both coordinating the transition and overseeing the Trump Organization's leas[e] of the Old

Post Office building, the balance clearly favors disclosure." Pl.'s Reply at 6.[8]  GSA insists that

its redactions under Exemption 6 are proper because the PTT members are not federal

employees, and that "the mere identity of these private individuals will not show what the

government is up to." Def.'s Opp'n at 13.  For the reasons explained below, GSA is, again,

wrong.

At the outset, GSA misapprehends the standard for Exemption 6.  In GSA's view, even

though the names of the PTT members were made public—and, in fact, easily accessible on a

website—the members' status as non-federal employees, standing alone, is sufficient to withhold

their names under Exemption 6.  Second Lewis Decl. ¶ 4 (citing U.S. Dep't of Justice, IX FOIA

Update, no. 4 (1988), for the proposition that PTT members are not federal employees for FOIA

purposes); *see also* Lewis Decl. ¶ 26 (stating that GSA used Exemption 6 because the PTT

---

[7]      As noted above, at least twenty-nine redactions under Exemption 5 do not correspond to any entries on the Revised *Vaughn* Index, s*ee* Second Cafasso Decl. ¶¶ 16–17, a deficiency GSA must correct if the material continues to be withheld.

[8]      The plaintiff does not dispute certain Exemption 6 redactions, namely: (1) "the redaction of the signatures of Trump PTT members so long as the identity of the individual is otherwise clear from the face of the document or is specifically disclosed in an accompanying *Vaughn* index"; (2) "individual, non-government email addresses" where "the names of the individuals were either still identifiable on the face of the email or provided separately in an accompanying *Vaughn* index"; or (3) "personal phone numbers." Pl.'s Opp'n at 17 n.6.

members "are not federal government employees").[9]  Contrary to GSA's construction of FOIA's

Exemption 6, neither the text nor relevant case law, permits, let alone requires, the automatic

withholding of non-federal employees' names.[10]

FOIA's Exemption 6 exempts from disclosure "personnel and medical files and similar

files the disclosure of which would constitute a clearly unwarranted invasion of personal

privacy."  5 U.S.C. § 552(b)(6).  "'Similar files' include 'detailed Government records on an

individual which can be identified as applying to that individual,'" *Prison Legal News v.*

*Samuels*, 787 F.3d 1142, 1146–47 (DC Cir. 2015) (quoting *Judicial Watch, Inc. v. U.S. Dep't of*

*Justice*, 365 F.3d 1108, 1124 (D.C. Cir. 2004) (quoting *U.S. Dep't of State v. Wash. Post Co.*,

456 U.S. 595, 602 (1982))), and encompass "not just files, but also bits of personal information,

such as names and addresses, the release of which would 'create[] a palpable threat to privacy,'"

*id*. at 1147 (quoting *Judicial Watch, Inc. v. Food & Drug Admin.*, 449 F.3d 141, 152 (D.C. Cir.

2006) (alteration in original) (quoting *Carter v. U.S. Dep't of Commerce*, 830 F.2d 388, 391

(D.C. Cir. 1987))).

The D.C. Circuit has explained that courts "follow a two-step process when considering

withholdings or redactions under Exemption 6."  *Am. Immigration Lawyers Ass'n v. Exec. Office*

*for Immigration Review*, 830 F.3d 667, 673 (D.C. Cir. 2016).  Once the records at issue are

determined to be "similar files," 5 U.S.C. § 552(b)(6), courts must take a second step "by

---

[9]    The Revised *Vaughn* Index indicates that "GSA performed a balancing test and determined that any public interest in the release of the names of private individuals here was not outweighed by the disclosure of that information," Revised *Vaughn* at 1–10, but this reasoning is absent from the agency affidavit, which, as indicated in the text, states only that Exemption 6 was invoked because the PTT members "are not federal government employees," Lewis Decl. ¶ 26.

[10]    The GSA does not even apply its incorrect interpretation of Exemption 6 with any consistency, despite its affiant's claim that his office follows that "practice for all other publicly known members of the public that are not federal employees."  Second Lewis Decl. ¶ 4.  The plaintiff notes that one email contains a list of PTT members "at a number of agencies . . . but GSA has only redacted the names of those Trump PTT members at GSA."  Cafasso Decl. ¶ 19; *see also id.* ¶ 20 ("The Communications Production contains emails where, in the span of a single email, GSA has disclosed the names of some Trump PTT members and withheld others.").

considering the significance of the privacy interest at stake," *U.S. Dep't of State v. Ray*, 502 U.S. 164, 175 (1991). This, in turn, requires "another two-step process" to determine first whether "'disclosure would compromise a substantial, as opposed to a *de minimis*, privacy interest,'" *Am. Immigration Lawyers Ass'n*, 830 F.3d at 673–74 (D.C. Cir. 2016) (quoting *Nat'l Ass'n of Home Builders v. Norton*, 309 F.3d 26, 33 (D.C. Cir. 2002)). "If no significant privacy interest is implicated . . . FOIA demands disclosure." *Nat'l Ass'n of Retired Fed. Employees v. Horner*, 879 F.2d 873, 874 (D.C. Cir. 1989). If a substantial privacy interest does exist, such finding "does not conclude the inquiry; it only moves it along to the point where we can 'address the question whether the public interest in disclosure outweighs the individual privacy concerns.'" *Multi Ag Media LLC v. Dep't of Agric.*, 515 F.3d 1224, 1230 (D.C. Cir. 2008) (quoting *Norton*, 309 F.3d at 35); *Am. Immigration Lawyers Ass'n*, 830 F.3d at 674 (explaining that the second step is to "weigh the privacy interest at stake 'against the public interest in the release of the records'" (quoting *Norton*, 309 F.3d at 33)).

The "'basic purpose of [FOIA] . . . focuses on the citizens' right to be informed about what their government is up to,'" and so "information that 'sheds light on an agency's performance of its statutory duties' is in the public interest." *Multi Ag Media*, 515 F.3d at 1231 (quoting *U.S. Dep't of Justice v. Reporters Comm. for Freedom of Press*, 489 U.S. 749, 773 (1989)) (alterations in original). Indeed, "FOIA's strong presumption in favor of disclosure is at its zenith in this Exemption 6 analysis." *Jurewicz v. U.S. Dep't of Agric.*, 741 F.3d 1326, 1332 (D.C. Cir. 2014) (internal citations and quotation marks omitted); *see also Nat'l Archives and Records Admin. v. Favish*, 541 U.S. 157, 165–66 (2004) (noting the phrase "clearly unwarranted" in Exemption 6 creates a higher bar for withholding responsive material than Exemption 7(C)). Thus, the Exemption 6 analysis ultimately requires balancing the public and

privacy interests, and "unless the invasion of privacy is 'clearly unwarranted,' the public interest in disclosure must prevail." *Ray*, 502 U.S. at 177 (quoting 5 U.S.C. § 552(b)(6)); *see also Morley*, 508 F.3d at 1127 ("Exemption 6's requirement that disclosure be 'clearly unwarranted' instructs us to 'tilt the balance (of disclosure interests against privacy interest) in favor of disclosure.'" (quoting *Wash. Post Co. v. U.S. Dep't of Health and Human Servs.*, 690 F.2d 252, 261 (D.C. Cir. 1982))).

Set against this binding guidance on the proper application of FOIA's Exemption 6, GSA stumbled in its application of Exemption 6 by automatically redacting the already-public names of PTT members when the law requires far more to warrant withholding. Certainly, an individual's name constitutes "information that applies to a particular individual," *Lepelletier v. FDIC*, 164 F.3d 37, 46 (D.C. Cir. 1999), and therefore may be subject to protection under Exemption 6, *see Judicial Watch, Inc.*, 449 F.3d at 152 ("We have also read the [FOIA] statute to exempt not just files, but also bits of personal information, such as names."). The D.C. Circuit has made clear, however, that Exemption 6 "does not categorically exempt individuals' identities because the privacy interest at stake may vary depending on the context in which it is asserted." *Am. Immigration Lawyers Ass'n*, 830 F.3d at 675 (quoting *Judicial Watch, Inc.*, 449 F.3d at 153) (internal quotation marks omitted) (alteration adopted); *see also id.* at 676 ("Because [the agency] here sought to justify its withholding of . . . names in purely categorical, across-the-board terms, it has not carried its burden to justify the Exemption 6 redactions."). Whether disclosure of an individual's name "is a significant or a *de minimis* threat [to privacy] depends upon the characteristic(s) revealed by virtue of being on the particular list, and the consequences likely to ensue." *Horner*, 879 F.2d at 877.

GSA argues that PTT members "remain private citizens with no guarantee of Government employment and, thus, enjoy some privacy interests in their identities," Def.'s Opp'n at 11, with "more than just a *de minimis* privacy interest in protecting their names from disclosure," Def.'s Mem. at 13. To bolster this argument, GSA offers only the speculation that "[s]hould these individuals' names be disclosed, they would be subject to unwarranted contacts and solicitations about their knowledge about the documents or their participation in the FOIA transactions." *Id.*[11] This concern about "unwarranted contacts" appears overblown, given the public disclosure already made by PTT, which posted online the PTT members' names, with their associated employers and liaison role at PTT with GSA. *See* Cafasso Decl., Ex. 4 (providing list from the Trump PTT website, greatagain.gov, that names the PTT eight members dedicated to GSA, accompanied by identification of their employers and status as volunteers or compensated PTT employees), ECF No. 14-3 at 163–65. This publicly available information could already facilitate the "unwarranted contacts" cited by the GSA, significantly undercutting the significance of any privacy interest associated with release of the same PTT members' names in GSA-produced records. Moreover, further undermining GSA's claim that these PTT members' names should be redacted, GSA attaches to its own summary judgment motion a GSA email to the plaintiff stating that "the individuals listed on the greatagain.gov [s]ite are those who were the members of the Agency Transition team in its entirety," and then listing the eight names, Def.'s Mot., Ex. D at 1, Email from GSA's Duane Smith to AO's Cerissa Cafasso (July 26, 2017), which names GSA acknowledges were publicly available, *see* Second Lewis Decl. ¶

---

[11] This speculative nature of this assertion is further demonstrated by the alteration of "would" to "could" in GSA's moving brief and subsequent opposition brief. Def.'s Opp'n at 12.

3.[12]  Notably, GSA's argument is not supported in the agency affidavit, which merely notes that "transition team members . . . are not federal government employees."  Lewis Decl. ¶ 26.

GSA presses its position that the PTT members have a privacy interest in non-disclosure of their names, citing the fact that courts have "protect[ed] from disclosure names that [an] Administration considered, but did not appoint, to [a] commission," Def.'s Opp'n at 12 (citing *Judicial Watch, Inc. v. Comm'n on U.S.-Pac. Trade & Inv. Policy*, No. 97-0099, 1999 WL 33944413, at *11 (D.D.C. Sept. 30, 1999)), as well as the "identities of possible candidates for Supreme Court vacancies," *id.* (citing *Voinche v. FBI*, 940 F. Supp. 323, 330 (D.D.C. 1996)). Those cases are inapposite, however, both because, as already noted, the PTT members' names, plus other identifying information, were made public by the Trump transition team on a publicly accessible website, and because GSA fails to support the premise that service on a presidential transition team is necessarily tantamount to applying for a federal job.  Thus, any analogy of transition team members to "unsuccessful [job] applicants," Def.'s Opp'n at 12, is a stretch too far.

In short, GSA's Exemption 6 redactions obscure which of the publicly-named PTT members were referenced in, or included on, certain emails, even though those names are already "out of the bag" and are no longer subject to a significant, protectable privacy interest.  *See Ray*, 502 U.S. at 175; *see also Lardner v. U.S. Dep't of Justice*, No. 03-180, 2005 U.S. Dist. LEXIS 5465, at *60 (D.D.C. Mar. 31, 2005) (finding Exemption 6 did not bar disclosure of names of unsuccessful clemency applicants, given that the conviction itself was public, "it cannot be

---

[12]  GSA's affiant acknowledged that the PTT members' names were public, Second Lewis Decl. ¶ 3, but nonetheless GSA responded to the plaintiff's Statement of Material Facts Not In Genuine Dispute, stating that the agency lacks "sufficient knowledge to admit or deny" whether these PTT members' names were publicly available and "[t]o the extent a response is required, Defendant denies the allegation[]," Def.'s Response to Pl.'s SMF ¶ 7, ECF No. 24-1.  GSA is directed to provide the Court with a full explanation of this apparent discrepancy in its submissions regarding whether PTT members' names were publicly available.

thought that the information that the individual later was denied a pardon application adds much additional embarrassment beyond the original conviction").  In other words, production of unredacted emails reflecting PTT members' names would not "constitute a clearly unwarranted invasion of personal privacy," 5 U.S.C. § 552(b)(6), and, consequently, these withholdings are contrary to the permissible scope of Exemption 6.

This analysis could stop here, but even crediting that PTT members retained some measurable privacy interest in non-disclosure of their names in response to the plaintiff's FOIA request, the applicable legal standard requires an additional showing that GSA cannot meet. More precisely, the public interest in disclosure militates strongly in favor of disclosure. Contrary to GSA's argument that disclosing PTT members' names "will not show what the government is up to, and thus are properly withheld under Exemption 6," Def.'s Opp'n at 13, presidential transitions are carried out pursuant to the Presidential Transitions Act of 1963, Pub. L. No. 88-277 (codified as amended at 3 U.S.C. § 102 Note (2018)), and the operation of this statute is clearly an appropriate focus of public interest and scrutiny.  Indeed, GSA's own website states:

> The transfer of power from one administration to the next marks a significant moment in U.S. history.  The Presidential Transition Acts of 1963 and 2015 give the General Services Administration (GSA) a prominent role in this process.  They authorize the Administrator of GSA to provide the President-elect and the Vice-President-elect the services and facilities needed to assume their official duties.

GSA, PRESIDENTIAL TRANSITION (2017), https://www.gsa.gov/governmentwide-initiatives/ presidential-transition.  Plainly, "information that 'sheds light on an agency's performance of its statutory duties' is in the public interest."  *Multi Ag Media*, 515 F.3d at 1231 (quoting *Reporters Comm. for Freedom of Press*, 489 U.S. at 773).

The plaintiff highlights the significant public interest in multiple facets of "know[ing] *who* participated in transition efforts but also . . . *to what extent* each Trump PTT member participated in the transition," Pl.'s Opp'n at 22 (emphasis in original), including how this information reveals (1) the manner in which "official representatives of President-Elect Trump executed 'the orderly transfer of the executive power' in light of the 'national interest' that such transitions 'be accomplished so as to ensure continuity in the faithful execution of the laws and in the conduct of the affairs of the Federal Government,'" Pl.'s Opp'n at 18–19 (quoting Presidential Transition Act of 1963, Pub. L. No. 88-277, § 2, 78 Stat. 153, 153 (1964)); (2) "how the transfer of power to the Trump Administration was undertaken" by GSA, Pl.'s Opp'n at 21; and (3) "who is shaping federal decisions and policy," Pl.'s Reply at 10.  Additionally, the plaintiff asserts "a public interest in shedding light on and weighing [President Trump's] conflicts of interest" given that his "financial interest in a government-owned property was the source of significant ethical concern during the transition."  Pl.'s Opp'n at 21–22; *see* Cafasso Decl., Exs. 6–11 (collecting news articles discussing ethics concerns raised by the Trump Hotel lease), ECF No. 14-3 at 190–226.

The Court agrees that "shed[ding] light on," *Multi Ag Media*, 515 F.3d at 1231 (quoting *Reporters Comm. for Freedom of Press*, 489 U.S. at 773), the actions of GSA and PTT members working with GSA in carrying out the agency's statutory duty during the presidential transition is in the public interest, and that any privacy interest of PTT members in non-disclosure of their names on communications with GSA is outweighed by that public interest in disclosure, *see id.* at 1230–33; *see also Ray*, 502 U.S. at 177 ("[U]nless the invasion of privacy is 'clearly unwarranted,' the public interest in disclosure must prevail." (quoting 5 U.S.C. § 552(b)(6))); *Am. Immigration Lawyers Ass'n*, 830 F.3d at 674 (rejecting an agency's "across-the-board

redaction of all [] names from all responsive documents" even where, "given the information already disclosed," there was only "'incremental value' served by disclosing" names (quoting *Schrecker v. U.S. Dep't of Justice*, 349 F.3d 657, 661 (D.C. Cir. 2003))); *Tokar v. U.S. Dep't of Justice*, Civ. No. 16-2410, 2018 U.S. Dist. LEXIS 52947, at *32–33 (D.D.C. March 29, 2018) (finding Exemption 6 did not protect from disclosure names of nominees not selected to be corporate monitors and the names of Department of Justice ("DOJ") employees or private attorneys making submissions to DOJ since "the release of even this small amount of information will serve the public interest, to an extent that outweighs the candidates for these lucrative positions' interest in keeping their identities secret"); *Gilman*, 32 F. Supp. 3d at 18 (concluding Exemption 6 did not authorize withholding of names and addresses of private citizen landowners in email communications with U.S Customs and Border Protection ("CBP") about construction of wall along the U.S.-Mexico border since public interest in "how CBP negotiated with private citizens regarding the planning and construction of the border wall . . . outweighs the implicated privacy interest").

Accordingly, the plaintiff is entitled to summary judgment as to the redactions, under Exemption 6, of PTT members' names, and GSA is directed to produce unredacted copies of the pages at issue.

## IV.    CONCLUSION

For the foregoing reasons, GSA's motion for summary judgment is denied and the plaintiff's cross-motion for summary judgment is granted in part and denied in part. Specifically, the plaintiff is granted summary judgment with respect to GSA's failure to produce attachments to responsive emails; GSA's withholding, under Exemption 5, of information shared with the PTT or other non-federal agency entities; and GSA's withholdings of the PTT members'

names under Exemption 6.  The plaintiff's cross-motion for summary judgment is denied, without prejudice, with respect to the adequacy of GSA's search, and to information withheld under Exemption 5 and the attorney-client privilege.

GSA is directed to: (1) submit, within twenty days of the issuance of the Order accompanying this Memorandum Opinion, an explanation of the apparent discrepancy between GSA's affiant's acknowledgement that the PTT members' names were public, Second Lewis Decl. ¶ 3, and GSA's response to the plaintiff's Statement of Material Facts Not In Genuine Dispute, which response stated that the agency lacks "sufficient knowledge to admit or deny" whether PTT members' names were public and "[t]o the extent a response is required, Defendant denies the allegation[]," Def.'s Response to Pl.'s SMF ¶ 7, ECF No. 24-1; (2) either, as directed *supra* in Part III.A, conduct, within thirty days of the issuance of the Order accompanying this Memorandum Opinion, an appropriate search and produce responsive, non-exempt records on a monthly rolling basis beginning no more than thirty days after completing its search, or properly justify its search; and (3) produce to the plaintiff, within forty-five days of the issuance of the Order accompanying this Memorandum Opinion: (a) non-exempt attachments to responsive emails; (b) responsive records previously withheld under Exemption 5 that have been shared with the PTT or other non-federal agency entities; (c) responsive records previously withheld under Exemption 5 and the attorney-client privilege, or a supplemental *Vaughn* Index fully justifying any such withholding; and (d) information previously withheld under Exemption 6 pertaining to PTT members' names.  Within forty-five days of issuance of the Order accompanying this Memorandum Opinion, the parties shall submit a joint status report advising the Court whether any disputes remain between the parties and, if so, a proposed schedule to resolve any remaining issues in this case.

An appropriate Order accompanies this Memorandum Opinion.


Date: May 3, 2018

_____
BERYL A. HOWELL
Chief Judge